GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS JR., SBN 132099
  tboutrous@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone: 213.229.7000
Facsimile:  213.229.7520

PETER S. MODLIN, SBN 151453
  pmodlin@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA  94105-0921
Telephone: 415.393.8200
Facsimile:  415.393.8306

EUGENE SCALIA, SBN 151540
  escalia@gibsondunn.com
HELGI C. WALKER (*pro hac vice forthcoming*)
  hwalker@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5306
Telephone: 202.955.8500
Facsimile:  202.467.0539

Attorneys for Plaintiff WESTERN STATES
PETROLEUM ASSOCIATION

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| WESTERN STATES PETROLEUM ASSOCIATION, a California not-for-profit corporation,<br><br>             Plaintiff,<br><br>      v.<br><br>THE CALIFORNIA OCCUPATIONAL HEALTH AND SAFETY STANDARDS BOARD, together with its members, DAVID THOMAS, CHRIS LASZCZ-DAVIS, LAURA STOCK, BARBARA BURGEL, DAVID HARRISON, and NOLA J. KENNEDY, in their official capacities, and THE CALIFORNIA GOVERNOR'S OFFICE OF EMERGENCY SERVICES, together with its Director, MARK GHILARDUCCI, in his official capacity.<br><br>             Defendants. | CASE NO.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiff Western States Petroleum Association ("WSPA") alleges, by and through its attorneys, as follows:

**PRELIMINARY STATEMENT**

1. On behalf of its members, WSPA seeks a court order declaring invalid and enjoining the enforcement of certain California state regulations that impermissibly and unconstitutionally interfere with the "comprehensive regulation of industrial relations by Congress" through the National Labor Relations Act ("NLRA"). *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236, 239 (1959).

2. This framework for the regulation of labor-management relations, enacted in 1935, is "an integral part of our economic life." *Garmon*, 359 U.S. at 239. Under the NLRA, "Congress has entrusted administration of the labor policy for the Nation to a centralized administrative agency, armed with its own procedures, and equipped with its specialized knowledge and cumulative experience." *Id.* at 242. That agency is the National Labor Relations Board ("NLRB").

3. The preemptive scope of the NLRA is vast. State regulations are preempted not only when they directly conflict with the NLRA, but also when the state regulates matters that are "arguably within the compass" of the NLRA—that is, when the state regulations involve conduct that is "arguably" protected or prohibited by the NLRA. *Garmon*, 359 U.S. at 246. Regulations are also preempted if they address conduct that "Congress intended . . . be *unregulated* [and] left to be controlled by the free play of economic forces." *Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Wis. Employment Relats. Comm'n* ("*Machinists*"), 427 U.S. 132, 140 (1976) (internal quotation marks and citation omitted) (emphasis added).

4. The California Process Safety Management ("CalPSM") Regulations and California Accidental Release Program ("CalARP") Regulations (together, the "Regulations") promulgated by the Defendants in 2017 purport to regulate directly the relationship, rights, and responsibilities of unions and employers. Specifically, the Regulations grant unions increased leverage and authority with respect to a matter that is already a mandatory subject of collective bargaining under the NLRA—workplace safety. Among other things, the Regulations explicitly confer authority on unions to designate "employee representatives" who are entitled to demand and receive safety

information and to participate extensively in process safety management ("PSM") and accidental release program ("ARP") activities at petroleum refineries. In this and other respects, the Regulations directly regulate unions' role and rights in the workplace, as well as employers' obligations toward these union-appointed "employee representatives." In so doing, the Regulations grant unions new and unbargained-for authority over employers' safety processes and safety-related expenditures. For example, the Regulations allow union representatives to determine which employees will participate in various safety reviews, and to participate themselves in the refinery's safety programs, including development of specific safety recommendations. This newly granted authority has widespread and important effects, including giving unions leverage to seek unrelated concessions in collective bargaining.

5. These matters—including employees' ability to select their "representative," and employers' obligations to recognize and deal with "employee representatives"—are already regulated by federal labor law and are already specifically addressed in collective bargaining agreements between petroleum refiners and unions. The Regulations therefore constitute a direct and unlawful intervention by the state in federally supervised labor-management relations.

6. To make matters worse, the Regulations also inexplicably and impermissibly afford preferential treatment to unions in designating employee representatives. They provide for participation in safety reviews at particular refineries by *unqualified* union-designated representatives who lack any employment connection to the refinery, while requiring non-union employee representatives to be qualified and located on-site. According to the Regulations, the employee representatives at non-unionized workplaces must be "on-site and qualified for the task," whereas union employee representatives can be virtually any "representative" chosen by the union, regardless of whether the representative is "on-site and qualified for the task." 8 Cal. Code Regs. § 5189.1(e).

7. Even without the Regulations, unions and their designated representatives may, of course, participate in safety-process and review functions. But as a matter of federal law, the parameters of their rights and employers' reciprocal obligations are to be determined by the NLRA and through collective bargaining and the "free play of economic forces," *not* by states or state agencies. Accordingly, the Regulations are squarely preempted by the NLRA.

8. Absent a declaration that the Regulations are preempted and a permanent injunction against their enforcement, WSPA's members are placed in an increasingly untenable position: comply with preempted regulations in violation of their federally protected rights or face significant liability for noncompliance.  The requested relief is necessary and warranted to redress a clear and ongoing violation of WSPA's members' rights.

## THE PARTIES

9. Plaintiff WSPA is a California not-for-profit corporation and a long-standing trade association of energy companies that own and operate properties and facilities in the petroleum industry—including petroleum refineries—within the Western states (Arizona, Nevada, California, Oregon, and Washington).  It is the oldest petroleum trade association in the United States.  WSPA's principal offices are located at 1415 L Street, Suite 600, Sacramento, California.  WSPA's members operate petroleum refineries in Contra Costa County, Los Angeles County, San Luis Obispo County, and Solano County, and are covered by the Regulations.  WSPA members own and operate most of the petroleum refineries in California.

10. Labor relations of WSPA's members (whether unionized or non-unionized) are governed by the NLRA.  The NLRA governs both unionized and non-unionized employers because it sets forth procedures for employees to select their representatives, establishes obligations that employers bear toward those representatives, and prohibits certain unlawful labor practices at all workplaces.  WSPA and its members have an interest in ensuring that state regulations do not interfere with the carefully crafted labor relations system created by the NLRA and enforced by the NLRB.

11. Defendants David Thomas, Chris Laszcz-Davis, Laura Stock, Barbara Burgel, David Harrison, and Nola J. Kennedy are all members of the California Occupational Safety and Health Standards Board (the "Board"), also a named Defendant in this action.  These individuals are appointed by the Governor and charged with setting standards for the California Division of Occupational Safety and Health.  These individuals or their predecessors and the Board promulgated the CalPSM regulations challenged herein.  The Board and its members have their principal offices at 2520 Venture Oaks Way, Suite 350, Sacramento, California.

12. Defendant Mark Ghilarducci is the Director of the California Governor's Office of Emergency Services ("OES"), a cabinet-level state public agency within the Office of the Governor of California and a named Defendant in this action. Defendants Ghilarducci and OES are charged with assuring the state's readiness to respond to and recover from all hazards and are responsible for overall state agency response to disasters. Defendants Ghilarducci and OES promulgated the CalARP regulations challenged herein. Defendants Ghilarducci and OES have their principal offices at 2650 Schriever Avenue, Mather, California, and 10390 Peter A. McCuen Boulevard, Mather, California, respectively.

## JURISDICTION AND VENUE

13. This Court has jurisdiction of this action under 28 U.S.C. § 1331 because the case arises under (i) the Supremacy Clause of the Constitution of the United States, Article VI, clause 2; and (ii) the laws of the United States, including the NLRA and 42 U.S.C. § 1983. This Court also has jurisdiction of this action under 28 U.S.C. §§ 2201 and 2202 because this is an actual controversy in which Plaintiff seeks a declaratory judgment.

14. Venue is proper in this district under 28 U.S.C. § 1391(b), because Defendants are residents of, are found within, have agents within, or transact their affairs in this district, and a substantial part of the activities giving rise to this action—that is, the promulgation of the unconstitutional Regulations—occurred in this district.

15. WSPA has associational standing to bring this suit on behalf of its members because more than one of those members will be directly, adversely, and imminently affected by the Regulations and thus would have standing to sue in their own right.[*] If the Regulations are not enjoined, WSPA's members face the "immediate or threatened injury" of enforcement actions. *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 342 (1977). Furthermore, the interests that WSPA seeks to protect by way of this lawsuit are germane to the organization's purpose. Specifically, WSPA is dedicated to addressing the wide range of public policy issues that affect the petroleum industry, including state regulations such as CalARP and CalPSM that impose

---

[*] A list of WSPA's current members is available on its website: https://www.wspa.org/about/ (last visited July 8, 2019).

unreasonable and unlawful mandates on WSPA members.  Finally, neither the claims asserted nor the relief requested requires an individual member of WSPA to participate in this suit.

## THE FACTS

### A. Background

16. As amended in 1990, Section 112(r) of the Clean Air Act (42 U.S.C. § 7412) directed the United States Environmental Protection Agency ("EPA") and the federal Occupational Safety and Health Administration ("OSHA") to develop regulations to prevent accidental chemical releases.  In response, the EPA and OSHA each adopted accident prevention plans to gather information on chemical accidents and to encourage industry members to improve process safety.  The plan led by OSHA became known as Process Safety Management, and the plan led by the EPA became known as the Risk Management Plan.

17. Pursuant to its congressional mandate, OSHA published a Final Rule for Process Safety Management of Highly Hazardous Chemicals on February 24, 1992.  29 C.F.R. § 1910.119.  This rule applies to processes involving chemicals, flammable gases, or flammable liquids above certain threshold quantities.

18. In 1996, the EPA promulgated a final rule for accident prevention under the Risk Management Plan.  40 C.F.R. § 68.1 *et seq*.  This rule requires owners or operators of facilities with more than a threshold quantity of a regulated substance to develop an accident prevention program.

19. Meanwhile, at the state level, the California State Legislature passed a law in 1986 calling for the development of an accident prevention plan, which would become known as the CalARP program.  Cal. Health & Safety Code § 25531 *et seq.*  The CalARP program tracks the requirements of Section 112(r) of the federal Clean Air Act and also includes other state-specific requirements.  Cal. Health & Safety Code § 25533.  Among other things, this legislation required OES to adopt regulations for the CalARP program.  OES promulgated its original CalARP regulations in 1997.  19 Cal. Code Regs. § 2735.3.

20. In 1990—the same year Congress amended the Clean Air Act—the California State Legislature enacted legislation calling for the Board to implement state PSM standards (Cal. Lab.

Code § 7855 *et seq.*) to "prevent or minimize the consequences of catastrophic releases of toxic, flammable, or explosive chemicals."

21. In 1992, the Board adopted state PSM standards, codified at 8 Cal. Code Regs. § 5189. These standards apply to more than 1,900 facilities in the state, including petroleum refineries.

22. In 2012, the Governor's Interagency Working Group on Refinery Safety (the "Working Group") issued a report concerning the safety of petroleum refineries in California. The Working Group's report recommended the establishment of an Interagency Refinery Task Force to, among other things, coordinate refinery-specific revisions to the state's PSM regulations and the CalARP regulations.

23. In 2013, the California State Legislature passed legislation mandating that the Board adopt PSM standards for refineries. Cal. Lab. Code § 7856.

24. Invoking that requirement, the Board promulgated a new PSM regulatory scheme applicable to petroleum refineries in July 2017—the CalPSM Regulation. 8 Cal. Code Regs. § 5189.1. A "general" violation of the CalPSM Regulation carries a $13,047 per-violation penalty (8 Cal. Code Regs. § 336(b)), and a "serious" violation of the CalPSM Regulation carries an $18,000 to $25,000 per-violation penalty (*id.* at § 336(c)). The penalty for a "willful" violation is multiplied by five, up to $130,464 per violation, and repeat violations are likewise subject to a scale of multipliers (i.e., two times for the first repeat; four times for the second repeat; ten times for the third repeat, up to $130,464 per violation). *Id.* at §§ 336(g) and (h). Failure to abate a violation can result in a daily penalty of up to $15,000. *Id.* at § 336(f).

25. Also in 2017, OES promulgated a new CalARP regulatory scheme applicable to petroleum refineries in California—the CalARP Regulation. 19 Cal. Code Regs. § 2735.1 *et seq*. A "general" violation of the CalARP Regulation results in a civil penalty of up to $2,000 per day plus the cost of any associated emergencies or remediation. Cal. Health & Safety Code § 25540(a)(1). A "knowing" violation of the CalARP Regulation results in a civil penalty of up to $25,000 per day (plus associated emergency or remediation costs), as well as misdemeanor criminal liability. *Id.* at §§ 25540(a)(4), 25540.1.

**B.     The CalARP and CalPSM Regulations**

26.     The CalPSM Regulation and the CalARP Regulation are substantively similar, and, according to the Board and OES, are designed to function in tandem.

27.     The Board issued its notice of proposed rulemaking and Initial Statement of Reasons for the CalPSM Regulation on July 15, 2016, setting the public comment period from July 15, 2016 to September 15, 2016, and a public hearing date of September 15, 2016.  During the comment period commenters expressed a number of concerns with the proposed regulation's employee-representation requirements, including that—in the words of one commenter—the proposed regulation "would be at odds [with] the policy underlying the National Labor Relations Act, which is to maintain equality of bargaining power between employers and employees and to avoid burdening or obstructing commerce through concerted activities which impair the interest of the public in the free flow of such commerce."  On February 10, 2017, the Board issued a notice of proposed modifications and set a March 3, 2017, deadline for comments on the modifications to the proposed regulation.  Thereafter, the Board issued a Final Statement of Reasons, failing to address adequately the public comments, including those submitted by WSPA.  Nevertheless, the CalPSM Regulation was approved by the Office of Administrative Law and filed with the Secretary of State on July 27, 2017.  The CalPSM Regulation became effective on October 1, 2017.

28.     OES issued its notice of proposed rulemaking and Initial Statement of Reasons for the CalARP Regulation on July 15, 2016, setting the public comment period from July 15, 2016 to September 15, 2016, and a public hearing date of August 31, 2016.  In response, commenters again raised a number of concerns about the proposed regulation's employee-representation requirements, including the inconsistencies between the proposed regulations and the NLRA.  On February 14, 2017, OES issued a notice of modification of text of proposed regulations and set a March 3, 2017 deadline for comments on the modifications to the proposed regulation.  Thereafter, OES issued a Final Statement of Reasons, which failed to adequately address the public comments, including those submitted by WSPA.  Regardless, the CalARP Regulation was approved by the Office of Administrative Law and filed with the Secretary of State on August 18, 2017.  The CalARP Regulation became effective on October 1, 2017.

29. Both Regulations require the participation of an "employee representative" in all elements of PSM and ARP. Each Regulation defines "employee representative" as "a union representative, where a union exists, or an employee-designated representative in the absence of a union *that is on-site and qualified for the task*." 8 Cal. Code Regs. § 5189.1(c) (emphasis added); *accord* 19 Cal. Code Regs. § 2735.3(t). A union representative can be from "the local union, the international union, or [be an] employee designated by these parties . . . ." 8 Cal. Code Regs. § 5189.1(c); *accord* 19 Cal. Code Regs. § 2735.3(t). Thus, in unionized workplaces, the employee representative must be a union representative, designated by the union. And the union may designate an employee representative to participate in CalARP and CalPSM without regard to the individual's qualifications or employment connection to the refinery.

30. The Board and OES have admitted that the Regulations provide different standards for union-designated representatives than for non-union representatives. The Board stated in its Final Statement of Reasons that "[e]mployees are entitled to select representatives of their choosing where a union exists. In the absence of a union, employee-designated representatives must be onsite and qualified for the task." Similarly, OES stated in its Final Statement of Reasons that "for nonunion facilities, the employee representative must be an on-site and qualified employee. Employee representatives from refineries at which the employees are represented by a union can be *whomever the union selects to be their representatives*." (Emphasis added.)

31. In addition to improperly attempting to regulate employees' and unions' selection of "employee representatives" for purposes of interacting with their employer, the Regulations give these employee representatives far-reaching rights and responsibilities for PSM and ARP processes, directly interfering with "the relations between employees, their union, and their employer." *Sears, Roebuck & Co. v. San Diego Cnty. Dist. Council of Carpenters*, 436 U.S. 180, 193 (1978).

32. Specifically, the Regulations give union "employee representatives" a right of access to, and require petroleum refiners to share, a broad range of safety-related information, including compliance audits, investigation reports, written procedures related to mechanical integrity, and "all documents or information developed or collected by the owner or operator pursuant to" the Regulations, "including information that might be subject to protection as a trade secret." 19 Cal.

Code Regs. § 2762.10(a)(3); 8 Cal. Code Regs. § 5189.1(q)(1)(C); *see also* 19 Cal. Code Regs. §§ 2762.5(a)(2), 2762.8(c), and 2762.9(k); 8 Cal. Code Regs. § 5189.1(j)(1)(C), (u)(3), (o)(11).

33. The Regulations also vest "employee representatives"—and accordingly, union officials—with a broad right to participate in developing and implementing the programs mandated by the Regulations. *See* 19 Cal. Code Regs. § 2762.10(b); 8 Cal. Code Regs. § 5189.1(q). Employers are required to ensure "effective participation by . . . employee representatives, *throughout all phases*" of PSM and ARP, 19 Cal. Code Regs. § 2762.10(a) (emphasis added); *see* 8 Cal. Code Regs. § 5189.1(q), including the "development, training, implementation and maintenance" of Process Hazard Analyses, Damage Mechanism Reviews, Hierarchy of Hazard Controls Analyses, Safeguard Protection Analyses, Management of Organizational Change assessments, Process Safety Culture Assessments, Incident Investigations, and Pre-Start-Up Safety Reviews required by the Regulations, 8 Cal. Code Regs. § 5189.1(q)(2); *see also* 19 Cal. Code Regs. § 2762.14(e); 8 Cal. Code Regs. §§ 5189.1(i) and (r) (specifying that employers must develop process-safety-culture assessments and pre-start-up safety reviews "*in consultation with*" employee representatives) (emphasis added).

34. The Regulations also require that petroleum refineries develop and implement a plan for "stop work procedures" and again do so "*in consultation with* employees" and the "employee representatives." 19 Cal. Code Regs. § 2762.16(f); 8 Cal. Code Regs. § 5189.1(q)(5) (emphasis added).

35. The Regulations further confer upon "employee representatives"—including union-designated representatives—the right to demand additional, tailored information from employers beyond the information that the Regulations require employers to share. For example, employee representatives have the right to provide "comments on the written audit report[s]," and employers are *required* to "respond in writing within 60 calendar days." 19 Cal. Code Regs. § 2762.8(c); 8 Cal. Code Regs. § 5189.1(u)(3). The Regulations also provide employee representatives with the right to submit "written hazard reports"—which can be submitted anonymously—and require owners and operators to respond in "writing within 30 calendar days." 19 Cal. Code Regs. § 2762.16(f)(2); 8 Cal. Code Regs. § 5189.1(q)(5)(B).

36. Unions are not limited to selecting a single representative who would be entitled to participate in ARP and PSM activities. Rather, "an authorized collective bargaining agent may select employee(s) to participate in overall Accidental Release Prevention program development and implementation planning and for employee(s) to participate in each team-based activity pursuant to this Article." 19 Cal. Code Regs. § 2762.10(b); *see* 8 Cal. Code Regs. § 5189.1(q)(2) ("Authorized collective bargaining agents may select (A) employee(s) to participate in overall PSM program development and implementation planning and (B) employee(s) to participate in PSM teams and other activities, pursuant to this section."). By contrast, in non-unionized workplaces, employers are simply required to "establish effective procedures in consultation with employees for the selection of employee representatives." 19 Cal. Code Regs. § 2762.10(c); 8 Cal. Code Regs. § 5189.1(q)(3). Unions' authority under the Regulations to select multiple "representatives" to participate in ARP and PSM further increases unions' power and leverage with respect to unionized employers.

37. And, as reflected in paragraphs 24 and 25 above, refineries face significant potential penalties if they fail to comply.

### C. Conflict with the NLRA

38. The employee-participation provisions of the CalARP and CalPSM Regulations directly regulate and interfere with labor-management relations, which are the exclusive province of federal law.

39. In 1935, Congress enacted the NLRA in order "to protect the rights of employees and employers, to encourage collective bargaining, and to curtail certain private sector labor and management practices, which can harm the general welfare of workers, businesses and the U.S. economy." National Labor Relations Board, *National Labor Relations Act*, https://www.nlrb.gov/resources/national-labor-relations-act (last visited July 8, 2019). The NLRA sets forth a comprehensive framework for the conduct and regulation of labor relations, including the selection of representatives, a set of rights and obligations with respect to those representatives, and processes for collective bargaining and the resolution of labor disputes.

40. As relevant here, the NLRA authorizes employees to select "representatives of their own choosing" who will "bargain collectively" on their behalf. 29 U.S.C. § 157. Representatives

selected using the NLRB's established election procedures become "the exclusive representatives of all the employees in [the election] unit for the purposes of collective bargaining." *Id.* at § 159(a). The NLRA imposes a "mutual obligation o[n] the employer and the representative of the employees" to bargain "in good faith with respect to wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d).  These terms and conditions include "safety on the job," which "is a mandatory subject of collective bargaining." *Pierce v. Commonwealth Edison Co.*, 112 F.3d 893, 896 (7th Cir. 1997).

41. "'When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the [NLRA], or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield,'" and the conflicting state regulation must be preempted. *Idaho Bldg. & Const. Trades Council, AFL-CIO v. Inland Pac. Chapter of Assoc. Builders & Contractors, Inc.*, 801 F.3d 950, 956–57 (9th Cir. 2015) (quoting *Garmon*, 359 U.S. at 244).

42. In violation of the NLRA, the Regulations purport to (a) govern how employees—through their union—select "representatives" to the employer for purposes of addressing a mandatory subject of bargaining; (b) give those "employee representatives" new and greater rights, and impose upon employers reciprocal obligations that touch upon and conflict with those established by federal law and achieved through collective bargaining pursuant to the free play of economic forces; and (c) threaten employers with penalties that far exceed those established by federal law in circumstances where employers fail to submit to these newly minted "employee representatives" and their *ultra vires* state-law labor rights. In all of these respects, and as explained above, the Regulations constitute a direct and unlawful intervention by the state in federally supervised labor-management relations.

43. The Regulations directly regulate labor-management relations and impermissibly give unions rights, power, and leverage not provided by the NLRA. Unions, in turn, are improperly empowered to make use of this leverage in entirely unrelated bargaining discussions with employers. And, by mandating that employers provide specific safety information to union representatives, the Regulations also impermissibly control conduct that is already controlled, or arguably controlled and

protected, by the NLRA. *See Oil, Chem. & Atomic Workers Local Union No. 6-418, AFL-CIO v. N.L.R.B.*, 711 F.2d 348, 360–61 (D.C. Cir. 1983) (unfair labor practice to deny union request for safety information when the requested information is "reasonably necessary to enable" the union "effectively to administer and police collective bargaining agreements or intelligently to seek their modification").

44. Employees may, of course, designate representatives for purposes of discussing, addressing, and improving workplace safety and safety processes. But this designation, and the representatives' reciprocal rights and responsibilities, are properly determined by the NLRA and through federally regulated collective bargaining between unions and employers, not by state fiat. The Regulations are therefore preempted by the NLRA.

### D. Injury from the Regulations

45. All WSPA members operating petroleum refineries in California must currently comply with the Regulations, which took effect on October 1, 2017. Failure to comply with the Regulations could result in significant penalties, while complying with the Regulations significantly alters the playing field of labor relations and violates WSPA members' federal rights.

46. WSPA's members are and have been subject to enforcement and threatened enforcement of the Regulations, including WSPA members that have been issued citations under the employee-participation provisions of the Regulations based on conduct in areas subject to collective bargaining.

47. The Regulations also present WSPA's members with an ongoing "Hobson's choice" of complying with the preempted Regulations in violation of their rights or suffering the threat of significant penalties. *See*, *e.g.*, *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) ("irreparable injury" existed where states "made clear that they would seek to enforce" law and plaintiffs faced "Hobson's choice" of "expos[ing] themselves to potentially huge liability" or "suffer[ing] the injury of obeying" law); *Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1334 (11th Cir. 2014) ("[a]bsent an injunction, [plaintiffs] will be forced either to incur the costs of compliance with a preempted state law or face the possibility of penalties"). WSPA's members have

no adequate remedy at law for these harms that they have suffered and will continue to suffer, and therefore injunctive relief is appropriate.

## COUNT I

### Violation of the Supremacy Clause (Preemption)

48. Plaintiff repeats and realleges paragraphs 1 through 47 of this Complaint as though fully set forth herein.

49. When a state or local law stands as an obstacle to the objectives of a federal law or intrudes on a field that Congress reserved for the federal government, the Supremacy Clause of the Constitution of the United States preempts that state or local law.

50. The Regulations are preempted because they intrude on areas that are encompassed by the NLRA. These Regulations are particularly egregious because they directly regulate the relationship between employers and unions—including the appointment and authority of "employee representatives" and employers' obligations to those representatives—and give unions rights to which they would not otherwise be entitled under federal law. NLRA preemption "has its greatest force when applied to state laws regulating," as here, "the relations between employees, their union, and their employer." *Sears, Roebuck & Co.*, 436 U.S. at 193.

51. In addition, the NLRA preempts the Regulations because they address conduct—employers' provision of or failure to provide safety-related information to union representatives, and employers' consultation or failure to consult with the union about safety—that is "arguably" protected or prohibited by the NLRA. *Garmon*, 359 U.S. at 246.

52. By mandating certain forms of employee representation and involvement in employer activities—forms which the NLRA does *not* mandate—the Regulations also encroach on an area that "Congress intended . . . be unregulated [and] 'left to be controlled by the free play of economic forces.'" *Machinists*, 427 U.S. at 140. Accordingly, Defendants may not lawfully enforce the Regulations.

## COUNT II

## 42 U.S.C. § 1983

53. Plaintiff repeats and realleges paragraphs 1 through 52 of this Complaint as though fully set forth herein.

54. Section 1983 of Title 42 of the U.S. Code provides in relevant part that anyone "who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the injured party in an action at law, suit in equity, or other proper proceeding for redress."

55. The NLRA establishes both employees' and employers' rights to engage in collective bargaining with respect to employee representation and employers' safety processes. Where the particular forms of employee representation on these issues are not established by the NLRA, they are to be left to the "free play of economic forces," *Machinists*, 427 U.S. at 140, and employers thus have a protected liberty interest in being free from regulations that mandate the forms of such representation.

56. Acting under color of California law, Defendants have deprived WSPA and its members of their federal rights under the NLRA to be free from "governmental interference with the collective-bargaining process," *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 109 (1989), by promulgating the Regulations.

57. Accordingly, Defendants are liable under Section 1983, and therefore subject to attorney's fees under Section 1988 of Title 42 of the U.S. Code.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of its members, prays that this Court:

1. Issue a declaratory judgment that the Regulations are invalid and unenforceable as a matter of federal law to the extent that they require the involvement of, or otherwise grant rights or authority to, unions or their representatives—including without limitation the specific provisions

discussed above—because such requirements are preempted by the Constitution and laws of the United States;

2. Issue a permanent injunction:

A. Restraining and enjoining the Defendants, their agents and employees, and all persons acting in concert or participation with them, from, in any manner or by any means, enforcing or seeking to enforce the provisions of the Regulations that require petroleum refiners to involve, or otherwise grant rights or authority to, unions or their representatives;

B. Requiring the Defendants to issue such notices, and take such steps as shall be necessary and appropriate to carry into effect the substance and intent of paragraph A above, including, but not limited to, the requirement that Defendants publicly withdraw and rescind any directions, requests, or suggestions to any company subject to the Regulations, that are inconsistent with judgment in this case;

3. Declare that Defendants violated 42 U.S.C. § 1983 by promulgating the Regulations and threatening their enforcement, and award Plaintiff the legal and equitable relief authorized by that statute, as well as a reasonable attorney's fee pursuant to 42 U.S.C. § 1988(b); and

4. Grant Plaintiff such additional relief as the Court may deem just and proper.

DATED: July 9, 2019

GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS JR.
PETER S. MODLIN
EUGENE SCALIA
HELGI C. WALKER

By: */s/ Peter S. Modlin*
    Peter S. Modlin

Attorneys for Plaintiff
WESTERN STATES PETROLEUM ASSOCIATION